UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHYLLIS JAGER,<br><br>                    Plaintiff,<br><br>      v.<br><br>DOORDASH, INC.,<br><br>                    Defendant. | Case No. 7:25-cv-01929<br><br>**COMPLAINT** |

Plaintiff Phyllis Jager ("Jager"), by and through her attorneys, Tarter Krinsky & Drogin LLP, as and for her Complaint against Defendant DoorDash, Inc. ("DoorDash"), alleges as follows:

### NATURE OF THE ACTION

1.      Jager brings this action following DoorDash's blatant retaliation against Jager in response to her raising alarming concerns about DoorDash's widespread failure to maintain adequate security and safety practices—and her offer to help DoorDash cure those failures at no cost to DoorDash.  Although Jager was one of DoorDash's largest individual customers over a period of years, DoorDash ignored Jager's offer and instead terminated its contract with her, falsely accusing her of fraud and publicly attacking her reputation.  Despite being put on notice of its systemic flaws and dangers, DoorDash engaged in vicious retaliatory conduct in November 2024, and there being no known basis for DoorDash's termination of Jager, it still has not restored her account.  DoorDash has tried to silence Jager rather than attempt to cure these matters, but it cannot hide from its conduct which poses threats to the physical and financial safety and emotional well-being of all of DoorDash's users.

2.     By way of background, DoorDash is an online delivery company, classified as a technology company, with a history of dangerous and reckless conduct that endangers and evidences a willful disregard for the safety of its customers and those that reside or work with them. In addition, it scams its customers by theft strategies such as charging false expedited service fees and fails to provide the tips left by customers to its Drivers who are known as "Dashers." DoorDash prefers to pilfer the tips as opposed to giving Dashers the money they earn and appropriately disbursing monies allocated by consumers to those Dashers.

DOORDASH SERVICES ARE NOT SAFE

3.     DoorDash misleads customers by falsely advertising that its services are safe and secure and that it requires all prospective and existing Dashers to undergo criminal background checks, which is intended to assure customers of their safety.  But in reality, DoorDash knows Dashers routinely have third parties (non-Dashers) present in their vehicles during deliveries and it does not take any steps to even identify those third parties, much less run criminal background checks on them.  Moreover, multiple incidents have occurred where DoorDash has approved Dashers who have a history of criminal violent acts, indicating that their background checks are clearly and inexcusably ineffective.  DoorDash also has inadequate practices to identify Dashers who commit violent crimes such as rape or assault or property crimes such as burglary, motor vehicle theft or arson after being signed up as drivers, putting consumers at risk from Dashers operating under the false pretense that they have no criminal history.

4.     More specifically, DoorDash repeatedly fails to adequately vet the backgrounds and criminal records of its drivers, who are known as Dashers, thereby enabling Dashers with histories of criminally violent acts to make deliveries to users' homes. While DoorDash may have a policy

banning Dashers with histories of violence, sex crimes or property crimes, it does not, upon information and belief, regularly enforce it.

5.      After Dashers are hired by DoorDash, DoorDash conducts minimal further vetting of them. To the extent any further vetting is done, it is not conducted on a regular basis and certainly not for every active Dasher. As a result, a Dasher who has a clean record as of their date of hire but who commits a violent crime thereafter can potentially remain a Dasher, delivering goods to consumers at their residences.

6.      Not surprisingly, Dashers throughout the United States, while making DoorDash deliveries, have assaulted, shot, and killed DoorDash customers and persons with no connection to a DoorDash transaction, including children. On other occasions, Dashers, after making a delivery to a residence, have returned to the residence and attempted to rape or have successfully raped or assaulted the customer.

7.      DoorDash claims that it doesn't stand for violence, inappropriate behavior by Dashers, failure to comply with the law or the use of its platform for any criminal activity. Yet, there are more than eighty-six reported criminal incidents committed by Dashers, with thirty-five being categorized as major crimes, e.g., murder, rape, assault, kidnapping, shootings, human trafficking, robberies and burglaries.

8.      There are currently at least 136 lawsuits against DoorDash pending in the US. These actions assert causes of action ranging from liability for Dashers' criminal conduct, to stealing Dasher tips and anti-competitive practices. Some of these are class action suits which means there are more than 136 total incidents. This count does not factor incidents which DoorDash may have settled without legal action.

9.      Worse, DoorDash knows that many Dashers rent or give out their accounts to others—persons who are not verified by any background check before they start taking DoorDash orders.  These are persons who obviously are unable to become Dashers in their own right—such as because they could not pass a background check—or may not have the documented legal status that would permit them to work in the United States. Not surprisingly, there is a black market for DoorDash accounts available for rent.

10.      DoorDash is also aware that it is a common practice for Dashers to bring additional riders in their vehicles when they make deliveries, in fact DoorDash invites it. In large part, these riders are not vetted by DoorDash in any manner whatsoever. In its website footer links DoorDash welcomes Dashers to bring ride along buddies and states they should be vetted but DoorDash can't effectively vet its Dashers correctly and certainly makes no real attempt to vet ride along guests. After interviewing several Dasher ride along guests, it's clear DoorDash isn't even aware who may be inviting ride along guests, who the guests are, and what their risk level may be. Many of these riders are likely using their time riding with Dashers to case consumers' residences so that they can later return to burgle the home, steal vehicles in the driveway or kidnap the children who live there.

11.      Not only have such practices been repeatedly highlighted in media reports when these faux Dashers commit criminal acts or other misconduct, but DoorDash has been directly put on notice of this, including during a Congressional inquiry.  DoorDash admits this is a serious concern.  Its director of "Dasher Integrity" has stated, "People rightly expect us to know who's at their doorstep or entering their business when they order with us."  But DoorDash has failed to take reasonable steps to correct its problems and instead continues to mislead consumers about their safety and security when dealing with Dashers.  And even now, that DoorDash says it's taking steps

to make changes, these changes are not robust enough nor broad sweeping enough, nor quick enough to prevent more crisis situations from occurring on more doorsteps.

12.    There is currently award-winning software available that DoorDash could easily employ and is in fact currently in use with much success by other online major multinational technology companies which would significantly reduce the risk and danger of DoorDash's unchecked and out of hand Wild Wild West delivery debacle. But if DoorDash employed such software in order to weed out drivers who were dangerous and not in compliance with regulations and laws, it would significantly reduce its driver pool, which would undoubtedly have a bearing on DoorDash's bottom line. So instead, with reckless disregard, DoorDash looks the other way while Dashers misbehave.

13.    While DoorDash claims it prohibits the sharing of Dasher accounts, there have been numerous incidents of such sharing resulting in the renter engaging in violent conduct while carrying out a DoorDash delivery, most notably Khalani Ogletree, a six-year-old child shot with a gel blaster by a perpetrator using another person's Dasher Account. The perpetrator himself was 16 years old at the time, using his grandmother's Dasher account, and had three other bullies riding with him. Another woman was shot in Jackson County, Michigan while confronting a Dasher about damaging a neighbor's lawn. It's been widely reported that the shooter was determined to be a person using another's Dasher account and had a criminal history. The victim is currently awaiting surgery to remove a bullet from her body, all while DoorDash has done nothing to address these incidents, rather denying the perpetrator was performing a DoorDash delivery at the time of the incident.

14.    Criminal incidents regularly make their way to the news cycle such as articles describing how a Dasher held a female customer's "food hostage in exchange for a sexual favor"[1] and a rape and murder in Georgia by a Dasher with a criminal past.[2]

15.    DoorDash has an estimated 8 million Dashers. This means that every day, millions of Dashers deliver orders to the homes and offices of innocent unsuspecting consumers and those consumers have no way to know who is really at their door, if they are verified (albeit inadequately), if they are the same person the DoorDash account is registered to, and whether the Dashers at their respective doorsteps pose a risk to them.

16.    Technology exists to ensure that the Dasher picking up an order and delivering it to a consumer is the actual Dasher to whom the DoorDash account is registered. Using this technology, DoorDash could make each Dasher verify their identity before they could accept an order. This would prevent unauthorized and therefore unvetted persons from delivering DoorDash orders to consumers, posing a serious risk of harm to them. Upon information and belief, Amazon.com uses this technology with its drivers. Yet, DoorDash has chosen not to use it.

17.    By using this technology, if the person  renting a Dasher's account was not the actual Dasher, the system would not be able to make a match and verify the Dasher, thereby preventing the transaction from going forward. This means the fake Dasher would not only never even see the order or consumer name and address, it would also never receive and be able to deliver any order again.

---

[1] *See* Horny DoorDash driver reportedly holds food hostage for sex, May 26, 2021, (https://nypost.com/2021/03/20/horny-doordash-driver-reportedly-holds-food-hostage-for-sex/)
[2] *See* DoorDash driver arrested after attacking Coffee Co. woman, March 2, 2022, https://www.walb.com/2022/03/02/doordash-driver-arrested-after-attacking-coffee-co-woman/

18.    If DoorDash implemented this type of stringent verification, it would likely lose a large portion of Dashers because a large portion of Dashers are undocumented aliens or can't make it through the vetting process based on their criminal histories.

19.    If DoorDash did in fact employ such software, then it would have to acknowledge all of the issues associated with their current operations, protocols, and procedures, and it would also have to invest in the fixes. By the nature of its inaction, it appears DoorDash is unwilling to do either of those.

20.    DoorDash has in fact publicly acknowledged the risks posed by Dashers. In its S-1 Statement filed with the Securities and Exchange Commission on November 13, 2020, DoorDash admitted that "[i]llegal, improper, or otherwise inappropriate activities by … Dashers … have occurred, and in the future may occur, which could adversely affect our brand, business, financial condition, and results of operations. These activities include food tampering, inappropriate or unsanitary food preparation, handling, or delivery, assault, battery, theft, unauthorized use of credit and debit cards or bank accounts, sharing of consumer accounts, and other misconduct. Such activities may result in injuries, property damage, or loss of life for consumers and third parties, or business interruptions, reputational and brand damage, or other significant liabilities for us." In other words, DoorDash has known about the threats its Dashers pose to the public but has purposely chosen to do nothing about it.

21.    DoorDash publicly claims to be against the use of alcohol and drugs but there are at least 11 criminal incidents of Dashing while intoxicated. More serious are the incidents of a Dasher causing death by dashing under the influence. There are ways to ensure there are no incidents of DUI, but DoorDash has not implemented them.

22.    Losing a large portion of its Dashers would significantly reduce DoorDash's ability to do business and generate revenue. As such, DoorDash chooses not to immediately and urgently implement more vigorous and frequent vetting of Dashers and technology which requires Dashers to verify themselves upon receiving each order.

23.    DoorDash knows that if it took effective action to weed it out bad Dashers, it would hit its bottom line. As it admitted in its S-1 Statement, "[i]f we fail to cost-effectively attract and retain Dashers or to increase the use of our platform by existing Dashers, our business, financial condition, and results of operations could be adversely affected."

24.    The effect of DoorDash's false advertising and lack of control and/or oversight with regards to Dashers and the unknown third parties involved in or directly handling deliveries is evident from the plethora of news reports of assault on DoorDash customers.

25.    Media reports indicate that, on December 26, 2024, a DoorDash customer in Jackson County, Michigan was shot shortly after a DoorDash delivery, either by the Dasher or by a third party who was present in the Dasher's vehicle; investigators determined there were two people in that vehicle.  Further reporting indicated that the shooter had a criminal record.[3] A news report quoted a DoorDash spokesperson as denying that the shooter was a Dasher, and the victim claimed she had been told the shooter was using another Dasher's account.[4]

---

[3] Felon Charged with Attempted Murder In Jackson County DoorDash Shooting, December 30, 2024, https://www.mlive.com/news/jackson/2024/12/felon-charged-with-attempted-murder-in-jackson-county- doordash-shooting.html
[4] Woman arrested in Jackson County DoorDash shooting, Jan. 3, 2025, https://www.wilx.com/2025/01/03/woman-arrested-jackson-county-doordash-shooting/

26.     In September 2023, a woman in Cincinnati, Ohio, was reported to have been sexually assaulted by a male DoorDash driver who was using the Dasher account of a woman in South Lebanon, Ohio.[5]

27.     In December 2023, a media report described a scheme in which a Dasher and a minor worked together to steal items from a property under the guise of making a DoorDash delivery to the property.  The scheme entailed the minor going around the side of the house to steal property while the Dasher approached the front door under the pretense of making a delivery.  While this Dasher was engaged in fake deliveries, it could have worked just as easily with routine deliveries. As an investigator interviewed in connection with the incident commented, "This is a textbook case of a very familiar business, and somebody being employed by that business, has used the cover of that business to commit a crime."[6]

28.     In March and May 2023, fatal motor vehicle accidents occurred in Milwaukee where unlicensed drivers, who nevertheless had been approved as Dashers and presumably passed background checks, struck and killed a total of six people.  Media reporting indicated that both drivers had their licenses suspended after prior driving offenses.  While DoorDash denied that these drivers were delivering for it at the time of the accidents, it gave no explanation for how these people were able to become Dashers, or to stay as Dashers available for deliveries.[7]

29.     These incidents are almost certainly the tip of the iceberg, and they exemplify the risk to Jager and consumers caused by DoorDash's misleading and/or false advertising and its

---

[5]*See*  https://midmichigannow.com/news/nation-world/woman-allegedly-licked-groped-by-doordash-driver-suspect-charged-with-assault-jonibek-rakhimov-chilis-delivery-lauren-taylor-gross-sexual-imposition-charge-account-deactivated

[6]     *See* https://www.walb.com/2023/12/18/lee-co-sheriffs-office-asking-help-identifying-suspected-door-dasher/

[7]https://www.tmj4.com/news/project-drive-safer/unlicensed-drivers-charged-in-deadly-crashes-working-as-doordash-drivers-on-the-side-complaint-shows; https://www.foxnews.com/us/wisconsin-doordash-driver-with-suspended-license-charged-striking-killing-pedestrian-reports

inadequate verification practices. Indeed, according to media reports, numerous incidents have occurred in recent years where Dashers engaged in crimes and other misconduct during the course of deliveries, including: a Dasher accused of assaulting a Pizza Hut employee in November 2024 for refusing to give him an order;[8] a May 2024 incident in which a Dasher reportedly held a customer at gunpoint to demand a tip;[9] a Dasher arrested for attempting to rape a customer in October 2023;[10] and a Dasher charged with twice using food deliveries in September 2023 to conceal package thefts.[11]

30.    It is common knowledge that DoorDash uses Dashers as mules. It pays little, encourages exhaustively long workdays, takes no responsibility for anything a Dasher does or needs, deactivates Dasher accounts with minimal notice, even when unwarranted, and offers no basic benefits such as health insurance. Yet, Dashers still work for DoorDash because they heavily rely on the income that they receive from DoorDash.  DoorDash relies on and preys upon this basic human need.

31.    In addition to acts of violence by Dashers, instances of Dashers engaging in unsafe driving, biking, or scooter riding are rampant as are instances of discrimination or harassment.

32.    Tampering with deliveries, opening packaging, or failing to maintain proper safety standards and care of food handling are widely reported by Dashers, consumers, and the media.

---

[8] https://www.newsnationnow.com/crime/doordash-driver-accused-of-assaulting-pizza-hut-employee-over-order/

[9] https://margatetalk.com/doordash-driver-holds-customer-at-gunpoint-46053

[10] https://www.firstalert4.com/2023/10/19/doordash-driver-charged-with-attempted-rape-st-louis-county/

[11] https://www.fox5ny.com/fox-shows/new-york-doordash-driver-charged-after-allegedly-using-food-delivery-to-steal-packages-off-porches

There have been numerous criminal cases involving this kind of conduct by Dashers, the most egregious being a Dasher who masturbated into a customer's food.[12]

33.     In addition, it is public knowledge that many Dashers are not in possession of valid driver's licenses and/or motor vehicle insurance and that Dashers employ a variety of workarounds in order to obtain and maintain the ability to make deliveries for DoorDash. Despite its knowledge of this issue, DoorDash has failed to take adequate steps to ban Dashers who lack a driver's license or adequate insurance.

34.     Upon information and belief, DoorDash knows it is illegal and/or a crime in the United States for a driver to operate a motor vehicle without a driver's license and/or adequate motor vehicle liability insurance.

35.     Upon information and belief, DoorDash, which has repeatedly asserted in courts throughout the US that its Dashers are independent contractors for whom DoorDash bears no legal or other responsibility for their conduct, knows that when a Dasher without insurance injures a person, the injured party will most likely not be able to recover damages for their injuries.

36.     A property owner cannot collect from an insurance policy for damages that may result from reckless or careless driving or other damage done to a property owner's assets if there is in fact no insurance in place. Occurrences of rented accounts by drivers using unregistered and uninsured cars or scooters are rampant and put all property owners at risk. DoorDash continues to look the other way on this.

---

[12] Phoenix woman sues DoorDash alleging driver masturbated on her food, Oct. 19, 2023, https://www.phoenixnewtimes.com/news/phoenix-woman-sues-doordash-alleging-driver-masturbated-on-her-food-17374696

37.    All of this illegal and otherwise dangerous conduct by Dashers exists in an environment in which DoorDash, unlike other companies such as Uber which interact closely with the consumers, lacks an internal security or investigative unit point of contact to act as a liaison with law enforcement.

38.    As publicly acknowledged in its S-1 Statement, DoorDash is well aware of the damage to and threat posed to the public caused by its inadequate background checks of Dashers, and its failure to prevent unvetted third parties from riding with Dashers and the renting of Dasher accounts.  Based on the multitude of media reports regarding assaults, rapes, murders, beatings, thefts, push-in intrusions, bullying, etc. caused by Dashers, renters of their accounts, and their guest riders, it appears that DoorDash has not taken reasonable steps to reduce the likelihood of harm to the public caused by Dashers, their renters, and those riding with them.

### DOORDASH STEALS ITS DASHERS' AND USERS' MONEY

39.    In addition to the physical harm to consumers caused by DoorDash's inadequate vetting and supervision of Dashers, DoorDash engages in fraudulent business practices that harm both consumers and Dashers.

40.    It has been widely reported that, when a customer leaves a tip for a Dasher through the DoorDash app, DoorDash retains a portion of the tip for itself, thereby defrauding the user who expects that the full amount of the tip will go to the Dasher.  DoorDash advertises that "Dashers receive 100% of all customer tips that DoorDash receives, including those earned on DoorDash Drive orders."[13] But the reality is much different.

---

[13] https://help.doordash.com/dashers/s/article/Do-Dashers-receive-tips

41.     In legal proceedings DoorDash has been proven to be a thief and ordered to stop its pilfering practices but its failure to yield its unlawful behavior with blatant disregard is telling of the fact that it's a dangerous and deceitful company.

42.     Upon information and belief, based on Jager's recent discussions with a former Dasher, as recently as late 2024, when a consumer pays a tip to a Dasher through the DoorDash app, DoorDash does not give the entire amount of the tip to the Dasher. Instead, DoorDash allocates a portion of the tip to the fees DoorDash is obligated to pay the Dasher for providing services, thereby decreasing the amount that DoorDash pays Dashers from DoorDash funds. This practice bolsters DoorDash's bottom line and decreases Dashers' income.

43.     For example, if a Dasher is supposed to receive a $10.00 fee for a delivery and the consumer provides a $5.00 tip for the delivery, DoorDash will allocate a portion of the tip (in this example $2.00) to the delivery fee and allocate the remaining portion of the fee as the tip, thereby decreasing its costs on the transaction. Thus, in this example, the Dasher receives the full $10.00 delivery fee but only $3.00 of the $5.00 as a tip. While DoorDash claims to have stopped this process, it has found other similar ways to re-engage.

44.     Using this practice, DoorDash can claim that it pays the full amount of tips to Dashers but in reality, it skims a portion of the tip off of the transaction, thereby bolstering its revenues. Based on the Fair Labor Standards Act (FLSA) regarding tips, the employer is not allowed to retain any portion of a tip meant for an employee unless it is part of a common tip pool to be distributed to all employees. Employers may employ a wage credit for tips to factor into the employee's wage to equal to the current minimum wage.

45.     This, however, does not apply to independent contractors. DoorDash is playing both sides of the classification of Dashers as independent contractors, treating them as employees by

using a portion of tip earnings as the Dashers' salary while treating them as independent contractors when there may be liability to DoorDash. This practice violates the FLSA in multiple ways.

46.     Upon information and belief, such deceptive practices induce consumers to provide tips with the expectation of the entirety of them going directly to the Dashers. Consumers may not have opted to assist DoorDash in feathering its nest by making deposits directly into DoorDash's bank accounts. Had consumers been aware that DoorDash was pilfering the tips and not allocating them in full to the Dashers, consumers, and Jager in this case, may not have or would not have allocated such tips.

47.     DoorDash also defrauds its customers by offering an "Express" delivery option for a $2.99 per order. DoorDash falsely creates the impression that by ordering "Express" means consumers will receive their orders quicker because it is being delivered "direct to you," without the Dasher making stops to pick up or deliver other orders. None of that is true.

48.     Despite DoorDash receiving an extra $2.99 for each "Express" order, DoorDash does not notify the Dasher delivering that order that the delivery is to be expedited. As a result, the Dasher proceeds as they would with any other order, potentially making additional pickups and deliveries along the way. In other words, consumers pay extra for nothing and DoorDash pockets the entire $2.99. Given that DoorDash fulfills millions of orders each day, many of which are "Express," the amount DoorDash obtains from this scam is enormous. This is theft. A true and correct of a screenshot showing the option to pay an extra $2.99 "Express" fee to receive their DoorDash order "Direct to You" is shown below.



49.     USO Inc., in response to DoorDash's practice of charging consumers an extra monetary fee for an "Express" fee for delivering "Direct to You" delivery enlisted a group of consumers to participate in a practical study of this service option.

50.     The goal of the investigation was two-fold, firstly to determine what in-fact is clearly known to both the consumer and the DoorDash driver (the "Dasher") about the express fee and secondly, did the Dasher in-fact deliver the consumer's order in a "direct" manner.

51.     A total of ten separate DoorDash food orders (the "Orders") were made by six investigation participants in Brooklyn, New York, Jersey City, New Jersey and Dallas, Texas.

52.     A total of nine orders were placed with the add-on Express Direct to You delivery option selected for an additional $2.99 above and beyond the cost of the food.

53.     Upon receiving their delivery, Dasher was asked what if any knowledge they had about the order they had delivered being an "Express" and/or a "Direct to You" order.

54.     Four Dashers acknowledged that they had no knowledge of the express delivery option being part of the orders, adding that there was nothing visually reflecting that option on their phones and two Dashers claimed to have delivered the order in a direct manner, with no additional order just prior.

55.     One Dasher turned out to be a different than the Dasher displayed in the Consumer's application.

56.     The remaining six dashers did not speak English with any level of proficiency to understand questions posed to them by the consumer.

57.     In addition, the Dashers realize no monetary benefit from the extra fee being applied to an order they are responsible for.

DOORDASH KNOWINGLY DOES BUSINESS WITH CHILDREN

58.     In order to expand its revenue base, DoorDash markets its services to and otherwise does business with minors despite its Privacy Policy stating the use of the DoorDash app and DoorDash Services is meant for persons "of the age of majority" in the jurisdiction in which [they] reside to form a binding contract with DoorDash." There is, however, no mention of age limitation within its consumer Terms and Conditions.

59.     Children of any age are able to create an account with DoorDash, place orders, and have deliveries brought to their place of residence or any other place directed by them, without obtaining a parent or guardian's consent. DoorDash does not ask for the user's date of birth in the sign-up process to determine if the user is of the age of majority, DoorDash does not make any effort to obtain a parent's consent and acceptance of its Terms and Conditions or the Privacy Policy, nor does it use widely available, easy to implement age verification software during the account registration process in order to prevent minors from using its services. DoorDash is acting recklessly by omitting these provisions that would better protect the safety of minor children just so it can maximize its revenue.

60.     Even worse, Dashers will physically hand deliver to and engage with young children who are visibly and obviously well below the age of being able to enter into a binding contract or are able to protect themselves from harm. This practice by Dashers amounts to the commission of child endangerment, as DoorDash cannot confidently verify the identity of its Dashers or of its third-party ride-alongs and therefore could be guilty of putting a child's health, safety or welfare in danger by allowing a possible pedophile and/or violent felon to have direct contact with an underage child.

61.      While DoorDash claims that it does not knowingly collect the user data of minors, this assertion is essentially false as DoorDash does not take measures to prevent minors from using its services. DoorDash is acting with willful disregard with respect toward protecting minor children from potential harm.

62.      Because DoorDash does not ask the most rudimentary of questions such as a user's date of birth, DoorDash has no reasonable way to identify an account belonging to a minor child and as such is acting recklessly.

63.      DoorDash does not direct children to collect permissions from a parent or guardian before signing up for its service or before using a credit card that certainly does not belong to them. Because DoorDash intends to lure younger users to use its service but knows it cannot do that out loud, DoorDash uses soft word-phrasing in order to say without saying users should not be under the age of 18 but never clearly makes that declaration and again takes no preventive steps to ensure or attempt to ensure that does not happen.

64.      DoorDash also makes no provision to determine if a user who is a minor child has permission to authorize a charge to a credit card or if he or she has obtained parental consent which is required to make payments for any order placed by a child.

65.      It is unlawful to use a credit card without the consent of the cardholder. DoorDash knows children do not have their own credit cards and it knows children are using its services. It knows children must use a credit card to pay for purchases on its site. It's reasonable to believe that DoorDash can't possibly think every child has authorization to use a card every single time a purchase is made, which means DoorDash is knowingly assisting children in making unauthorized purchases with credit cards not belonging to them.

66.     By allowing minor children to access and make purchases on the DoorDash website or application and by allowing Dashers to physically hand deliveries to children, DoorDash places children at risk of violent harm or kidnapping.

67.     DoorDash states their target audience is Millennials and GenZ, yet it never specifically states that its customers must be over the age of 18. In most jurisdictions, children under the age of 18 are not legally eligible to enter into a contract such as DoorDash's Terms and Conditions or Privacy Policy.

68.     GenZ'ers are identified as being individuals between the ages of 13-28. Approximately 26 million of them are under the age of 18. To further qualify that statement the US Census reports there are approximately 42.9 million children in the United States between the ages of 10 and 19 which would encompass the 13-18 age range as well.

69.     Twenty-six million is a large potential user pool. If DoorDash asked for a date of birth at sign up, it would undoubtedly eliminate that potential customer pool. By using vague wording, DoorDash can continue to operate with wanton disregard. If it asks for a date of birth DoorDash knows it would be held to regulations put in place in order to protect children. DoorDash is careful not to put any age-specific references in its  marketing because it can't by law market to minors.

70.     DoorDash further scams consumers by requiring them to upload unencrypted photographs of the fronts and backs of their credit and debit cards in order to maintain their DoorDash accounts without having adequate security measures in place to store these photos, thereby increasing the chances that users' personal and financial information will be stolen.

71.     Upon information and belief, DoorDash's flawed systems incorrectly and frequently flag accounts as engaging in suspicious behavior or fraud. In order to maintain their accounts, users who are accused of suspicious behavior or fraud are required to upload unencrypted photos of their credit cards.

72.     DoorDash does not make users aware that it may require them to upload photos of their credit or debit cards during the final steps at checkout process and if the user fails to do so, the transaction cannot be completed, whereas a user must comply in order to complete a transaction. This process is separate from entering payment card information stored with a third-party payment management system unknown to the user having to hand over private sensitive data in order to pay for food orders. The demand is being made to supposedly verify the validity of information entered into the payment system and is not spelled out in the Terms and Conditions.

73.     While DoorDash can't manage to adequately verify its drivers and it can't keep user data safe as evidenced by its numerous data breaches, it believes it has entitlement to snatch the entire sixteen digits of a consumer's credit or debit card and store that together with the card's expiry, CVV code, associated address, telephone number, other associated addresses to the user and countless more data points.

74.     DoorDash collects full images of user credit/debit cards without users having a clear understanding that the forced handing over of information may or will be required of them. DoorDash does not disclose this process in its Terms and Conditions or Privacy Statement.

75.     Users do not consent to this process during the DoorDash sign-up because this is not disclosed.

76.     DoorDash collects full images of user credit/debit card data without users having the ability to consent to such data collection with informed clarity as to where data will be stored, who will see the data, who may ever see the data, how long the data may be stored, why the data is being collected and who insures the data and user in the event of corporate data theft, intrusion or data breach.

77.     In 2024, DoorDash was fined $375,000 by California's Attorney General for selling its customers' personal information to marketing co-ops without informing them or providing an opportunity to opt out in violation of the California Online Privacy Protection Act.

78.     Though data verification companies say they store data as prescribed by industry standards, they often don't. A photo of a payment card is typically stored in full view and can be seen by anyone who logs into or hacks into the data storage system. It is not encrypted and therefore vulnerable to potential hackers. With DoorDash's history of data breaches, the exposure is magnificently real.

79.     Given DoorDash's long-standing history of documented bold, brazen frauds and thefts and their continued efforts to maintain such behavior even in spite of court rulings and subsequent orders to stop such behavior, DoorDash should never under any circumstances be entitled to grab such sensitive data and hold it to do with it what it will without notice to the customer that this could happen to them.

## **THE PARTIES**

80.     Jager is an individual residing in and domiciled in Orange County, New York.

81.     DoorDash is a Delaware corporation with a principal place of business located at 303 2nd Street, San Francisco, California.

## JURISDICTION AND VENUE

82.    This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, as a claim under federal law is asserted and there is complete diversity of citizenship between Jager and DoorDash and the amount in controversy exceeds $75,000.  Jager is a citizen of, and is domiciled in, New York, while DoorDash is a citizen of, and is domiciled in, Delaware and California.

83.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue occurred in this judicial district, and pursuant to the forum selection clause in the Consumer Terms and Conditions agreement between Jager and DoorDash, which provides that any court suit between the parties must be brought "in the United States District Court for the District in which you reside if you are not a California citizen or resident."  Jager resides in Orange County, New York, which is within this District.

## SPECIFIC ALLEGATIONS

### DOORDASH PLACED JAGER IN DANGER

84.    DoorDash is the dominant online food delivery service in the US market, by many accounts holding greater than a 60-percent share of the market.

85.    Such dominance has resulted in the near-ubiquitous presence of Dashers in our streets and our restaurants.

86.    DoorDash represents that customers have nothing to fear from these Dashers, assuring them that DoorDash "uses accredited third-party background check providers, including Checkr to run secure background checks on all prospective and existing Dashers."[14]

87.    Checkr Inc., the third-party company that DoorDash employs to perform background checks on potential Dashers as well as periodic follow-up checks, employs AI-based background checking software to perform its background checks. Due to the software's limitations and lack of human oversight, there have been numerous claims of incorrect data being returned. Using outdated information and returning data from incorrect persons have caused Dasher applicants to not be considered for, or Dashers being removed from Dasher positions due to this information. During the past five years, Checkr has faced at least 80 lawsuits related to the Fair Credit Reporting Act.  Cases such as *Golightly v Checkr*, *Buckley v Checker and Uber*, underscore this point.

88.    Additionally, the *New Hampshire Union Leader* reported the lack of human oversight of the artificial intelligence used by background screening provider Checkr has resulted in errors, and the company in December 2018 settled a class-action lawsuit that alleged it illegally included information about low-level offenses such as traffic infractions on background checks for more than 96,000 people. Checkr agreed to pay out $4.46 million in damages plus attorneys' fees. Checkr's background checks are limited to a seven-year window for any criminal or driving offenses. Any incidents that do not fall within this timeframe are not considered. This allows criminals to pass under Checkr's "radar" and become acceptable for an applicant to be hired. The reporting of inaccurate credit or criminal reporting is a violation of the Fair Credit Reporting Act (FCRA) 15 U.S.C. §1 681.

---

[14] https://help.doordash.com/dashers/s/article/Dasher-Background-Check-FAQ?language=en_US#what-is-the-process

89.    Upon information and belief, these are the most common mistakes made during background checks by Checkr:

- Criminal records that contain incorrect information, such as dispositions (for example, "guilty" instead of "not guilty") or severity (for example, misdemeanors listed as felonies).

- Reporting out-of-date information – The record of an expunged conviction or criminal record should not appear on a background check.

- Criminal records belonging to someone else with the same or similar name appear on another person's report by mistake.

- Mixed files – occurs when a background reporting agency includes someone else's criminal background in your report.

No matter which direction these inaccuracies move, a consumer cannot definitively determine whether the Dasher making their delivery has not been convicted of violent crimes or thefts. This directly damages Jager, zuMedia, its shareholders, employees and contractors by putting them in potential danger on numerous occasions.

90.    But DoorDash's representation that customers have nothing to fear from these Dashers is misleading and/or false because DoorDash is aware that its background checks are inadequate to secure all the persons who make food deliveries for DoorDash, and DoorDash knows this.  Indeed, DoorDash is not even aware of the identities of all the persons involved in making those deliveries.

91.    As DoorDash admitted in its S-1 Statement, "[i]f the background checks conducted by our third-party background check providers are inaccurate or do not otherwise meet our

expectations, unqualified Dashers may be permitted to make deliveries on our platform, and as a result, we may be unable to adequately protect or provide a safe environment for our merchants and consumers and qualified Dashers may be inadvertently excluded from our platform. For example, we had a Dasher who had a criminal conviction that should have excluded him from using our platform who was nonetheless cleared by one of our background check providers, and as a result, we allowed him to make deliveries on our platform and he was subsequently alleged to cause personal injury to a merchant on our platform. As a result of inaccurate background checks, our reputation and brand could be adversely affected and we could be subject to increased regulatory or litigation exposure. In addition, if a Dasher engages in criminal activity after the third-party background check has been conducted, we may not be informed of such criminal activity and this Dasher may be permitted to continue making deliveries on our platform."

92.    Though it should, DoorDash does not disclose to the public all of the third parties it does business with, so when a consumer signs up for the DoorDash delivery service they do not have an advance opportunity to make an informed decision as to whether or not they want to pass on being a part of the DoorDash community or whether they want to take a risk and rely on DoorDash's use of Checkr.

93.    DoorDash does not disclose to consumers that it will use the verification service Checkr. Checkr has been sued, according to online information, for breaches and generating incorrect information. Users may prefer not to engage the service when they can't be sure that Dashers are properly vetted and that DoorDash has true and accurate information about the individuals it dispatches to their doors. But DoorDash takes the right of choice away from consumers by not disclosing any of their third-party affiliates so consumers are not given the ability to make the decision that best suits them.

94.    It is well-known to DoorDash and its users that third parties commonly are present in a Dasher's vehicle when the Dasher is making a DoorDash delivery.  But there is a significant difference between these Dashers and non-Dashers: only the former receive background checks, albeit inadequate ones. While DoorDash touts that it runs background checks on its Dashers, and it says it means to for third parties accompanying them, it does not do so for such third parties.

95.    DoorDash has no ability to actually verify any unknown third-party riding along in the vehicle of a Dasher because DoorDash has no real way to ever know who, if anyone, ever gets in a Dasher's vehicle.

96.    DoorDash could easily learn whether or not Dashers had unknown third party guests in vehicles by simply employing software services currently available that would give them in-depth insight as to what goes on inside of a Dasher vehicle but if DoorDash did take such a responsible, adult step in the corporate world as to genuinely vet and verify its Dashers, it would then not be able to get away with claims of it not being aware and having no responsibility for anything that may go wrong as a result of its reckless business model.

97.    DoorDash is only aware of the identities of Dashers who are registered in its system to provide deliveries.  The non-Dashers who may accompany Dashers are invisible to DoorDash, as they are not monitored or recorded by DoorDash. DoorDash appears to mean to keep it that way even despite the enormous risk this imposes on the public at large.

98.    DoorDash also does not exercise any control over those third parties, such as by requiring Dashers to identify to DoorDash and/or to consumers the identities of the third parties present with the Dashers during deliveries, by requiring Dashers to operate without third parties being present, and/or by requiring that those third parties undergo the same safety measures that

DoorDash applies to Dashers, such as required background checks, to ensure that those third parties do not pose a risk to DoorDash consumers.

99.    If DoorDash made, created and enforced such rules, it would likely result in having no Dashers to speak of.  As acknowledged in its S-1 Statement, DoorDash has built an ultimately unsustainable business model. Any change to its current arrangement would likely result in a catastrophic collapse. DoorDash needs to continue to prey on individuals who need to work for it in order to maintain solvency. Doordash needs an endless stream of Dashers because current ones catch on to the DoorDash way of stealing driver pay, tips, and funds from the bank accounts DoorDash provides, or if it starts carefully vetting or pushing back on bad driver behavior, it will have no Dashers.

100.    DoorDash's rules encourage the presence of third parties in Dasher's vehicles during deliveries. This puts all consumers in direct danger. DoorDash recommends to Dashers that having another person in the vehicle with them will make their job safer.

101.    DoorDash encourages the Dashers to obtain an LLC since they are independent contractors but does not require or even recommend obtaining general business liability insurance, leaving victims of Dashers it assigns without recourse.

102.    In effect, DoorDash enables these unvetted third parties to trespass on the property of DoorDash users, posing a significant risk of harm to Door Dash users.

103.    When a third-party ride along comes on to a property, whether invited by the Dasher or not, that third party is trespassing. While DoorDash falsely claims to not authorize Dashers to invite third parties without DoorDash "properly vetting" them, consumers certainly are not

authorizing such entry upon their property by these persons, and Dashers have absolutely no authority to do so, which means that individual is there uninvited and in violation of trespassing.

104.    DoorDash's intentionally turning a blind eye to additional riders prevents consumers from having any understanding that there may be an unknown unauthorized third party at its doorstep, which makes the entire general public DoorDash's potential victim pool.

105.    When a third-party ride along, unknown to DoorDash and uninvited by a consumer, appears on the property of a consumer, it then has the power to come back at any later date it may see fit and inflict any damage it sees fit. There will be little or no chance of ever identifying such person because the person started as a ghost and was never known to anyone beside the Dasher, and that Dasher could even have been using a rented account. Victims have no recourse whatsoever.

106.    In knowing that Dashers rent or give out their accounts to other persons unknown to DoorDash and who are not verified by it, DoorDash has not taken reasonable steps to correct this problem. DoorDash continues to publicly promote that Dashers can and should bring third-party ride-alongs on their dashing journey. DoorDash likely engages in this practice because it knowingly has no control over such Dasher activity and rather than be seen with egg on its proverbial face, DoorDash would rather save face and appear aligned and supportive of what it knows it does not the power to prevent without changing its business model by, among other things, implementing readily available technology. But the fact that DoorDash is unable to prevent such behavior is precisely the problem with its entire business model.

107.    DoorDash misleads consumers by touting the criminal background checks it runs on its Dashers even as it knows such background checks are ineffective in the face of its failure to take adequate steps to prevent those purportedly verified Dashers from simply handing their verified accounts to unknown, unverified persons. DoorDash does not have an adequate process in place to

prevent Dashers from sharing accounts with unverified or unknown persons, providing an avenue for individuals who are not listed on an account or known to DoorDash to make deliveries.

108.   Once an order is placed in the DoorDash application, and a Dasher accepts the order for delivery, the application informs the user of the identity of the Dasher, by first name only, who will be delivering the order. There is no image of the Dasher to ensure that the person delivering is the actual Dasher account holder. However, this still does not protect consumers from third party bad actors.

109.   But this is fundamentally misleading to consumers when that Dasher has given their account to someone else. The lack of additional verification allows this practice to continue unchecked. It is a loophole that allows bad actors to infiltrate the Dasher ranks leaving consumers exposed with no idea who is actually making their deliveries.

110.   While it appears that one obvious answer may be to simply not use DoorDash if a consumer doesn't trust it— that's no longer an option. Since the start of the COVID Pandemic in early 2020, DoorDash took steps to embed itself in the days and lives of the consumer public.  Its business model calls for it, and the Pandemic provided the urgent consumer need that gave DoorDash the boost it needed to become a major player in the technology and delivery space. This, however, put DoorDash at an unfair advantage. They had what the public needed at the time and the public knew it needed such service so it succumbed. The public never considered the potential dangers of DoorDash; it rather only focused on the need DoorDash could fulfill.

111.   DoorDash became a necessary utility rather than a luxury delivery facilitator. And to this day DoorDash delivers to areas where there are few delivery options, they deliver to those who are housebound, to busy folks too busy to get out and get their own stuff, they deliver to parents home with sick children, those who don't drive or can't afford a vehicle and therefore can't travel far

or transport anything, to invalids, and even to individuals like Jager who became reliant on the service to provide meals for 150 staff members and contractors. Jager is too busy to take the three to four hours that daily delivery process takes but Jager also knows how important and necessary it is to so many who count on it daily.

112.   Jager repeatedly has had orders delivered by persons who clearly and visibly are not the Dasher identified by the application, e.g., the actual delivery person is of a different gender and/or overall general appearance than the Dasher which the application claims is delivering the order.

113.   Jager repeatedly has had orders delivered by persons who were not alone in the vehicle, and often there were multiple occupants.

114.   These issues have been highlighted repeatedly in news reports concerning assaults on DoorDash customers by these unverified third parties.

115.   Indeed, similar issues were raised by U.S. Senators in a letter sent to DoorDash sent in April 2024, which raised the issue of account sharing and demanded that DoorDash identify "What steps are you taking to increase security on your application and ensure that account holders are the only individuals delivering food through your services?"[15]  While DoorDash subsequently claimed it was making efforts to strengthen its processes, those efforts are unknown and, based on Jager's experiences, unsuccessful.

116.   Jager is the Chief Executive Officer of zuMedia, Inc. ("zuMedia"), a company headquartered in New York.

---

[15] https://www.blackburn.senate.gov/services/files/ACAD1F19-9772-4D77-AA58-D82D9C63C45A

117.    Jager has been in the tech space for upwards of fifteen years. Over that period, she has worked on countless technology projects and developed an extensive amount of technology.

118.    As a result of her experience, Jager is fully familiar as to how a company like DoorDash can use existing technological solutions to improve the safety of the services it provides.

119.    zuMedia maintains a set of offices in Monroe, New York.

120.    Jager regularly ordered meals using DoorDash to provide meals for zuMedia's employees at the Monroe offices as well as the many contractors who provide maintenance, construction, and landscaping services at and around these offices.  In fact, Jager believes she, on behalf of zuMedia, may be among DoorDash's most significant users (by volume and order size) as, using food delivered by DoorDash, zuMedia regularly feeds approximately 150 people each working day.  Since 2021, Jager placed not less than but likely more than 4,380 orders totaling, upon information and belief, at least $3.4 million.

121.    The over 4,000 regular deliveries to the Monroe offices have afforded Jager a prime opportunity to observe the workings of DoorDash, both the good and the bad.

122.    Upon information and belief, a substantial number of these orders were delivered by Dashers different than the Dasher identified in the DoorDash application when the order was placed.

123.    While the convenience of food deliveries is appreciated, the risks DoorDash imposes on Jager, zuMedia's shareholders and employees, and members of the public in general, are substantial given the inadequate vetting of Dashers and its failure to prevent unvetted third parties from riding along with Dashers or the leasing of Dasher accounts to them.

124.    Indeed, given DoorDash's shoddy vetting practices and failure to prevent unvetted third parties from riding along with Dashers during deliveries, combined with the extremely large numbers of DoorDash deliveries to zuMedia, Jager, the shareholders, and zuMedia's employees were likely placed in serious danger of physical harm on countless occasions to an extent we won't know for certain any time soon given these unknown individuals could reappear whenever they deem appropriate for themselves to do so.

125.    It is routine for Dashers to photograph deliveries as proof orders were completed.

126.    But there appear to be few to no controls regarding those photographs.

127.    Dashers (or the third parties in the vehicles with them) are free to take as many photographs of the delivery locations as they wish, and to do with those photographs as they please.

128.    Jager and others at zuMedia's Monroe offices regularly have observed Dashers, and the third parties traveling with them, taking photographs of the vehicles that are located in the driveways of the offices—which driveway and vehicles are not immediately adjacent to the delivery location.  Even the photographs showing the deliveries routinely record much more than the deliveries themselves, often needlessly depicting zuMedia's employees, large areas of the Monroe office premises including, but not limited to, security systems such as door locks, keypads, smart doorbells, and cameras.

129.    Dashers have too much leeway with regard to photographing on the premises of consumers. There's an enormous amount of information in a photograph. Photos are telling of location, wealth level, ease of access inside of a dwelling, door lock placement and type, alarms etc. Delivery photos often contain other information as well such as cars, license plates, adults and children, pets, mailboxes, address plates, gates and backdoor access, and location data which is

helpful for a return trip. Having these photos to take home and study allow Dashers the ability to, at their leisure, study the photos and learn enough information to assist them in future break-ins, floor plans, alarm system work arounds and accesses, window placement and ease of access, and sidelights which can easily give an idea on what can be seen happening inside the home from the outside. Having such helpful insights makes it unfairly easy for any Dasher or unknown ride along Dasher to return at any time most least expected and inflict harm onto trusting consumers. Below are true and correct copies of photographs taken by Dashers of the deliveries they made to Jager.











130.    While Dashers are required to take proof of delivery photos, there should be no other type of photos taken. There is no reason for any other types of photographs to be taken let alone retained during or following a delivery, but DoorDash has no known policy requiring Dashers to dispose of photographs (or to verify said disposal), or of requiring Dashers to engage in proper practices to avoid misuse regarding the taking and retention of the photographs. DoorDash delivery photos are taken through the app but there is no known expiry period and there is no known location where such photos are stored or kept.

131.    Dashers are not insured or bonded.

132.    While photos as proof of delivery are important, there is no reason whatsoever for the photographs to include anything other than the delivery item(s).  They would be concerning even if they were being taken only to satisfy the prying curiosity of a Dasher.  But the photographs are especially concerning to Jager (and presumably to other DoorDash users who become aware of these practices) because the more likely purpose is the surreptitious collection by Dashers and their accomplices of information about zuMedia's premises and vehicles.

133.    Such practices place Jager and every employee of zuMedia at risk, as well as every other user of DoorDash and the persons who work or reside at DoorDash delivery locations.

134.    There is software available that would reduce the content of a delivery proof photo to only the delivery item(s) and either blur or pixelate the background. This is one of the items on Jager's list of critical issues to be worked on with DoorDash, but DoorDash refused to acknowledge there was an issue and instead chose to do nothing to protect consumers and their privacy.

135.    In pre-DoorDash days, a car full of people quietly photographing a residence or office, particularly at night, would be immediately suspicious, as it would be believed they were "casing" the home as a potential burglary target in the future.

136.    The rise of DoorDash and other delivery services has made it less unusual to see strangers taking photographs of a home or office, but in so doing it has also made it much simpler for malicious persons to take advantage of this development to openly do now what previously would have to have been done in the shadows.

137.    While such persons can engage in these acts without being associated with Dashers, the prevalence of DoorDash deliveries gives such malicious persons easy opportunities to gain access to targets of interest.

138.    These opportunities are magnified when third parties ride along with Dashers, or when those third parties are the ones conducting deliveries under the false pretense that they are legitimate Dashers, persons who are not subject to background checks by DoorDash and whose identities are unknown to DoorDash.

139.    The DoorDash Consumer Terms and Conditions, an agreement between DoorDash and each user of its services, including Jager, concerning the use of those services, does not contain any provision permitting Dashers or others to photograph security systems, vehicles or other property.  Nor do the Consumer Terms and Conditions provide for the use and storage of such photographs.  A copy of the Consumer Terms and Conditions is attached as Exhibit A.

140.    The photographs taken by Dashers and the persons accompanying them on deliveries can be used for purposes beyond burglary and vehicle theft.  They can be used in connection with the abduction of children.  This is a world in which nefarious parties place literal orders on the dark web for children specifying age, gender, and physical requirements, and those fulfilling those orders stalk potential targets until the ideal victim is identified.

141.    But Jager's concern, and most peoples' concerns, are not limited to such specific crimes.

142.    Heightening these concerns for Jager, on multiple occasions after a DoorDash delivery, Jager has received a text from the Dasher remarking upon zuMedia's property and/or the vehicles parked there.

143.    DoorDash, by having no policies regarding the retention and use of photographs taken by Dashers and enabling unknown third parties with unknown intentions unfettered opportunities to collect private information in innocuous ways, poses a substantial risk of harm to consumers, their children, and their property.

144.    Even though DoorDash photos are taken through the DoorDash app, Dashers have repeatedly stood there, brazenly snapping pictures with their phones beyond the required photo. DoorDash's ability to easily implement software that would fix the issues regarding unauthorized or improper photo grabs and its lack of action to do so demonstrate willful disregard.

### JAGER NOTIFIES DOORDASH OF INTENT TO BRING A DISPUTE

145.    On November 6, 2024, Jager sent a notice to DoorDash advising it of her intent to initiate an informal dispute resolution conference with DoorDash (the "November 6 notice"). The Notice was intended to address the ongoing safety and security concerns with the DoorDash application and services as well as to provide potential solutions to improve these services at no cost to DoorDash.

146.    This is the initial step required by the DoorDash Consumer Terms and Conditions when a user seeks to raise a dispute with DoorDash that may lead to legal action.

147.    Under the Consumer Terms and Conditions, a user cannot commence litigation against DoorDash for at least 60 days after sending the notice of intent to initiate an informal dispute resolution conference and until after the conference is held.

148.    The purpose of this initial step, and the required waiting period, is for the parties to try to work together to resolve the dispute without the need for costly litigation.

149.    DoorDash itself states in the Consumer Terms and Conditions that, "You and DoorDash agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome."

150.    Unfortunately, only Jager has acted in good faith.

151.    In the November 6 notice, Jager described the risks discussed above and told DoorDash that she wanted to work with it to investigate various approaches that might reduce those risks, including requiring photographs to be taken through the DoorDash app (and for them to expire within a reasonable time after the delivery is made), Jager also wanted the DoorDash app to track how long it takes a Dasher to exit the location because a lengthy stay post-delivery could mean the Dasher was snapping photos or doing something else he or she shouldn't be doing, like taking pictures. If DoorDash can track orders going in, they can most certainly track Dashers going out.  Jager also wanted to ensure all occupants of a Dasher's vehicle were required to be registered with and vetted by DoorDash, and/or adding information to the DoorDash app so that customers have means of tracking who has been to their home and when. Jager wanted to make DoorDash aware of the software used by other technology companies for this exact thing. Jager wanted a date of birth to be requested during sign up to protect children from DoorDash's predatory ways. There were other major issues Jager had set her sights on having fixed as well, such as requiring a specific type of identification badge worn on duty that could only be in effect if the Dasher were actively employed by DoorDash. In other words, a previous employee who was just let go wouldn't be able to trick its way back onto a consumer's doorstep because the badge or lack thereof would indicate the Dasher status was deactivated. Jager also wanted to raise the issue of insurance.

152.    DoorDash didn't act upon learning it had numerous unauthorized, undocumented Dashers, and Dashers who operate motor vehicles and scooters without insurance or registrations,

rendering victims powerless in the event of harm or injury inflicted by Dashers. DoorDash found a way to insulate itself from any responsibility by claiming it's not a delivery service, it's not a food service, it's not a retailer or restaurant, but rather a technology company. DoorDash claims it has no responsibility in and for any wrongdoing whatsoever that it directly causes or may cause through its Dashers. DoorDash unleashes its flawed systems, faulty services, inadequate protections, and dangerous Dashers and unknown to all—there is no insurance for any damage or harm it may and often does cause.

153.    DoorDash categorizes Dashers as independent contractors yet does not require them to have general liability insurance.

154.    DoorDash encourages third party ride along guests but never takes any reasonable steps to vet these individuals.

155.    DoorDash is well aware its Dasher pool is filled with undocumented workers who rent the accounts of other Dashers or buy them from bad actors.

156.    DoorDash invites and welcomes endless improper and dangerous circumstances, refuses to accept any responsibility for anything that goes sideways, and has the brazen audacity to green-light the operators of its derelict operation to parade through our streets and towns without proper or adequate insurance on roads and at the doorsteps of America.

157.    DoorDash has itself carefully protected while its victims are left reeling in pain and in DoorDash's path of destruction from uninsured bad actors and its own flippant policies.

158.    DoorDash forces users to agree to egregious Terms and Conditions which not only confiscate their rights but render them victims.

159.    DoorDash refuses to designate Dashers as employees.

160.    DoorDash refuses to take action with regards to unknown third parties in Dasher vehicles.

161.    DoorDash does not in its Terms and Conditions make any mention whatsoever of the fact that the unknown, unverified, third-party occupants of vehicles will be on the doorsteps of its consumers.

162.    But it forces users to agree to its terms full, well knowing in this day and age many consumers need and rely on its service. This leaves consumers little choice but to agree to and use the services of DoorDash.

163.    Consumers believe, at the very least, DoorDash knows who is standing at their doorstep. But, DoorDash can't for certain say who is at a consumer's doorstep, and it cannot and will not keep consumers safe from harm.

164.    When a Dasher arrives at the doorstep of a consumer and then commits an egregious act of any sort such as property damage, or bodily harm, etc., the property owner has no recourse. While most Dashers have some type of auto insurance policy, many do not. But auto insurance cannot cover any bad acts inflicted by Dashers that are not directly related to driving an automobile. This means that the consumer is left without recourse, since DoorDash classifies its Dashers as independent contractors and assumes no responsibility for Dasher behavior, automobile insurance policies don't cover bad and criminal behavior outside of a vehicle, and most Dashers have no general liability insurance because DoorDash refuses to protect users of its service and require that its Dashers have a such policy in place.

165.    Consumers have nowhere to go and most often are not even sure of the starting point in order to seek a path to be made whole from inflicted harm or damage, let alone have

familiarity with the process of initiating such action or have the resources to do so. Property owners would need to pursue legal action directly against the DoorDash driver to seek compensation for the damage, which could include having to go as far as filing a lawsuit.

166. But DoorDash has made that nearly impossible because it does everything in its power to ensure it does not have to prevent undocumented Dashers or third party ride along Dashers from Dashing. If it did, it would significantly reduce its Dasher pool, causing a tighter bottom line and less shares to be cashed out by its leadership.

167. So, if there is an incident such as any of the countless shootings, rapes, beatings, etc. that are widely reported to have occurred and continue to occur on a regular basis on the doorsteps of the consumer public as a result of rogue Dashers, the consumer is the one that significantly suffers. Over and over again, the consumer suffers.

168. Jager attempted to discuss with DoorDash how it could go about requiring its Dashers to obtain and maintain continuous general liability insurance for the benefit and safety of the 340,000,000 Americans that are not only its potential delivery pool but also its potential victim pool. To do so would have meant DoorDash would not have as many Dashers which would mean its gross revenue was reduced. Greed keeps DoorDash from exercising the duty of care it's obligated to do.

169. DoorDash ignored Jager's request.

170. Approximately six weeks after Jager reached out to DoorDash with a request to assist in working with it on matters Jager believed were critically urgent and demanding of immediate action, there was a shooting of a consumer by a Dasher who was operating under a "borrowed" Dasher account. A few weeks later—another shooting.

171.    Both shootings would have--not could have--but would have NOT occurred had DoorDash not maintained its repulsive position of consistently doing nothing in order to make their own operation safer.

172.    Jager offered to work with DoorDash to investigate whether these and other approaches might reduce the risks described above in a cost-effective manner. But DoorDash did not accept this opened hand of cooperation from a power user of its services at no cost to DoorDash. Instead, DoorDash retaliated.

## DOORDASH FALSELY ACCUSES JAGER OF FRAUD

173.    First, on or about November 13, 2024, for the first time ever in the history of Jager's and DoorDash's relationship, but after Jager called DoorDash out on its crimes and dangers, DoorDash tagged Jager as a fraudster and required her to input a special PIN each time a Dasher arrived with the order as the Dashers were not permitted to drop off the delivery until Jager provided the PIN. This PIN is employed by DoorDash when and if it suspects a consumer of fraud to act as proof that the delivery was made so the consumer cannot state the order never arrived and receive a credit of payment.

174.    Jager has never falsely reported that she didn't receive an order when she did. And DoorDash has never even once flagged Jager's account for any reason whatsoever.

175.    In other words, each time Jager placed an order, the Dasher was informed that she was a fraudster. By employing the PIN to Jager's account, DoorDash announced that she is a fraudster to all Dashers making deliveries to her. With the enormous volume of orders placed by Jager without incident to suddenly have this stigma attached to her account after the November 6 notice is blatant retaliation.

176.    Dashers know when this PIN protocol system is used, it means DoorDash has determined that fraudulent use of a particular account exists or likely exists. That is DoorDash uses this system to prevent suspected fraudsters from committing fraud is publicized on DoorDash's own website and has been reported in the media.

177.    The PIN requirement was put in place during a time of the year that Jager heavily uses her DoorDash account. As a result, the number of orders placed by Jager and the number of Dashers who were notified of Jager's PIN requirement was significantly higher than other times of the year.

178.    DoorDash is regularly dragged through the media and courts for all sorts of deceptive practices, deceptive pricing, misleading practices, thefts, and frauds.

179.    Jager has an upstanding reputation, yet DoorDash brazenly and wrongfully publicly accused Jager of misconduct while taking zero responsibility for the wrong it does.

180.    The application of DoorDash's PIN requirement on Jager meant that Dashers were not permitted to simply leave Jager's deliveries on her doorstep, which was the prior practice in every single use occurrence between Jager and DoorDash. Instead, Jager was forced to open her door at the risk of possible push in assaults, thefts, etc., and personally go outside and come face to face with the potential danger of an unknown, at best poorly vetted, and possibly undocumented Dasher who may or may not be a bad actor or even the actual Dasher who was supposed to be making the delivery, and physically engage in the action of PIN swapping with the Dasher. Below are true and correct copies of screenshots showing the obligation for Jager to provide a PIN code to Dashers in order for Jager to receive her DoorDash deliveries.



✕

# You'll need to provide a PIN for your delivery

To make sure this order is correctly delivered, the Dasher will collect a PIN code from you

**How it works**

👁 A 4-digit PIN will be shown on the order tracking page

📍 Share the PIN with the Dasher to confirm you received your order





3:03



doordash.com/or

# DOORDASH



**Track your order in real time**

Get the app →

## Delivery in progress

Arrives between **3:04 – 3:05 PM**



### Delivery PIN

Provide this 4-digit code to your Dasher at drop off to receive your order.

**3044**

**Hide order details    Help**

    **Your Dasher**
Marlena

    **Michaels**
2 Items

    1× Ashland Red & White Standing Santa Holding Christmas List & Teddy Bear 6'
$499.99

48

181.    DoorDash's abusive, willful, and wrongful infliction and branding of Jager as a fraudster not only imposed harm and damage to Jager but also to the reputation of others at Jager's premises who used DoorDash's service during that same time and had DoorDash's PIN process applied to their respective account(s) as well, given their addresses (via IP) were known to be the same as Jager's.

182.    None of the parties, including Jager, whom DoorDash inflicted the offensive and demeaning label of fraudster on, had ever or have ever before or after had such PIN process (or anything similar) inflicted upon them when ordering from DoorDash or any other service.

183.    Jager is the CEO of many companies. By falsely declaring Jager a fraudster and forcing Jager to engage in degrading PIN play with unknown stranger Dashers which DoorDash frequently allows to run amok and who are known to rape, shoot, kill, stalk, rob, and harass DoorDash not only seriously damaged Jager's good name, but it put her at risk and in danger.

184.    Jager has been an avid user of DoorDash since 2021 with an approximate $3,400,000.00 spend. For safety reasons, Jager had never before accepted a delivery face to face with a Dasher. This means she has a standard practice of never opening the door to Dashers for any reason whatsoever. Jager's practice is to wait several minutes, ensure the Dasher has left her property, then collect or have another person collect the deliveries. Jager was forced by DoorDash and its demeaning PIN play to open her door numerous times and deal with Dashers in-person or have someone else do it, potentially putting that person in the same exact danger Jager would have been in.

185.    There were numerous interactions between Jager and Dashers between the time DoorDash falsely flagged Jager and her card as a fraudster and the time it ultimately and wrongfully canceled Jager's account. This means DoorDash, by forcing Jager to interact in person

with Dashers who may or may not have been accurately verified or who may have a violent criminal record, put Jager at risk and in danger numerous times in addition to what it already had over the years of Jager using the service, and it eventually becoming known to Jager that the Dashers were often not who they were supposed to be.

186.    DoorDash continued its retaliatory conduct by, on a pretextual basis, terminating Jager's DoorDash account and blocking her from receiving its services.

187.    On or about November 18, 2024, a DoorDash customer service representative, while on the phone with Jager, informed Jager that DoorDash had no record of any of the over 4,000 transactions that Jager made through the DoorDash website since 2021. The DoorDash customer service representative on a recorded line, specifically told Jager during the conversation that Jager's statement of having ordered thousands of times and having spent millions of dollars was untrue, effectively calling her a liar. According to the DoorDash representative, Jager's account profile showed no purchases prior to November 16, 2024.

188.    Upon information and belief, DoorDash, as part of its retaliatory scheme and knowing of potential litigation with Jager, intentionally deleted its internal records showing the history of Jager's transactions or at the very least blocked customer service workers from seeing them in an attempt to silence Jager.  If Jager was made to believe there was no record of any transaction she'd rung-up over the years, and millions of dollars spent, perhaps she would go away quietly.

189.    DoorDash, since at least 2021, has not provided adequate means for its users to review their purchase history online, making it impossible for users to, among other things, verify whether the full amount of the tips they designated for Dashers were actually given to Dashers.

DOORDASH STEALS JAGER'S DEBIT CARD INFORMATION

190.    On or about November 18th, 2024, as Jager was in the process of checking out an order, a system check prohibited the completion of said order and required Jager to scan her card.

191.    DoorDash demanded that for Jager to complete the transaction, Jager needed to verify the zuMedia Bank of America Visa debit card listed on her DoorDash account by providing photographs of all the information printed on the debit card.

192.    In other words, in order for Jager to continue using DoorDash and be able to provide breakfast for approximately 150 employees and contractors who work at or provide services to zuMedia's offices each business day as she has done every single day for nearly four years, she was effectively forced by DoorDash to provide access to her zuMedia debit card.

193.    DoorDash does, in fact, offer PayPal as an alternative payment method, however that too is associated with Jager's zuMedia debit card and given it would also be processed via DoorDash's system, it would most likely have received the same flag. There would have been no difference as to which path Jager took because either option leads you back to the same place—DoorDash's flawed and deceptive system.

194.    DoorDash  did not explain to Jager how or where the debit card information would be stored.

195.    DoorDash had not, in its Terms and Conditions nor in its Privacy Statement, or in any other place in its advertising, or displayed on its website, disclosed that it would ever ask for such information and in such an exposing and downright reckless manner.

196.     Jager never at any point in her relationship with DoorDash agreed to such a
shamelessly intrusive data grab, rather at the exact moment it happened, as over the past years,
Jager had to get food provisions for 150 persons so they could get their day started.

197.     Without other options, Jager complied with DoorDash's demand and forwarded
photographs of the zuMedia debit card to DoorDash using the upload function on the DoorDash
website. Upon information and belief, documents and information sent using the application's
upload feature are not encrypted.  This is a photo, it doesn't truncate. On the Admin side a photo
comes through as a photo. It is not blurred, pixelated, or hidden in any other way. DoorDash's
employees, agents, affiliates, associates, etc. see a fully viewable photo with all credit and debit
card data when it reaches the DoorDash admin side. This means anyone can see the card data and
anyone who has access to DoorDash's data collection storage can not only see the data but use it
in conjunction with the data on Jager's addresses, phone number, etc. because DoorDash's account
profiles contain that information. This would be all the information that any bad actor would
require to annihilate any consumer's existence. In the case of Jager, that information is directly
connected to the company's shareholders, employees, and the actual company itself.

198.     DoorDash has given itself full access to Jager's life. All her personal details are
now in the hands of known thieves who have, over a period of more than a decade, displayed
wanton disregard for human beings, data, and privacy.

199.     DoorDash can now not only access Jager's name, addresses, phone number, debit
card number, CVV, card expiry, corporate name, bank name, but it can sell or trade the information
as it has been known publicly to do, or it can just use it to pilfer funds off Jager's card in order to
feather its own nest, another maneuver DoorDash is famously known for.

200.    All of this is incredibly risky. A person armed with a bank account holder's full debit card number and associated information can drain the entire bank account in any number of ways.

201.    Upon information and belief, over the past few years. DoorDash and the third parties it uses to process and store users' payment information have experienced multiple data breaches which exposed the personal and payment information of their users.

202.    Upon information and belief, DoorDash, when obtaining photographs of users' debit and credit cards, does not comply with the Payment Card Industry Data Security Standard ("PCI DSS"). PCI DSS is a mandatory set of security standards imposed on merchants by card issuers such as Visa in order keep credit card users' payment data safe and secure.

203.    Now that DoorDash has access to the zuMedia debit card, there is little limit to the harm it can cause to zuMedia Inc., its individual shareholders, and to Jager, as DoorDash now has access to her personally identifiable information.

204.    DoorDash has not advised Jager how or where it has stored the photo of the debit card that it had absolutely no authority to collect, store, or even look at.

205.    DoorDash has, at least in the past, knowingly violated industry standard data storage protocols, and DoorDash and its known third party service providers have all experienced data breaches in recent years.

206.    DoorDash aligns with companies that are widely known to be open to fraud and other schemes because DoorDash is widely known to actively engage in such fraud and other schemes.

207.    DoorDash uses a company called Fiserv to, among other things, process payments.

208. Fiserv helps process payments and provides banking services to DoorDash delivery drivers via the DoorDash Crimson program.

209. Fiserv has been involved in numerous data breaches.

210. Bessemer Systems FCU sued Fiserv after a security review and found over 40 weaknesses in Fiserv's security. The review also found that Fiserv shared confidential member information with an unauthorized third party and intentionally placed invalid return addresses on member statements.

211. In May 2020, Fiserv's First Data Merchant Services paid $40 million to settle Federal Trade Commission (FTC) charges. The charges alleged that First Data knowingly processed payments for scams that targeted hundreds of thousands of consumers. The settlement covered swindles such as processing payments and laundering credit card transactions for scams, ignoring warnings from employees, banks, and others about the fraud, helping to launder payments for companies that were breaking the law.

212. In spite of the numerous scams, frauds, weaknesses rampant within Fiserv, DoorDash felt its best alignment was indeed with Fiserv.

213. DoorDash engages in the very same or close to the same types of frauds and schemes that Fiserv does and DoorDash has been sued for the very same scams and misleading tactics as Fiserv.

214. DoorDash clearly can't adequately protect user data for any sustainable period yet without observing any protections or regulations it effectively swiped Jager's debit card and exposed it in full view.

215.    Submitting to DoorDash's willful negligence was not ever at any time disclosed in DoorDash's Terms and Conditions or Privacy Policy, and had Jager known of DoorDash's alignment with its scheming partners and affiliates, Jager would have never under any circumstances engaged in DoorDash's services such as they are.

216.    DoorDash is very careful to not share information as to who its partners are, and it appears DoorDash does so because if the general public had such information, it would be able to put the pieces together just as Jager has.

217.    Upon information and belief, DoorDash practices the same thieving techniques as its affiliate partner, Fiserv.

218.    DoorDash deliberately makes no representation as to who specifically will handle the exposed data it collects yet it, without prior consent and informed clarity, confiscated all sixteen digits of Jager's corporate debit card together with the accompanying expiry and CVV information for an account with millions of dollars in it at the time of the data grab. There is no known reason for DoorDash to have such information.

219.    DoorDash has no known unit that manually looks over and verifies each and every piece of data associated with such a data grab, and DoorDash has still, months later, yet to restore Jager's account, although DoorDash knows Jager is not a fraud and DoorDash knows Jager has used this same payment account since she opened her DoorDash account. It appears that DoorDash applies varying schemes and tactics to retrieve data from its trusting consumers in order to pillage consumer funds and gather, collect, sell, and allow access to such data in order to unjustly enrich itself.

220.    Not surprisingly, a few weeks after Jager provided DoorDash, under duress, with unencrypted photographs of zuMedia's debit card on which her name appears and with which other personal information is obviously associated, Jager received a notification that her personal information was now appearing on the Dark Web.

221.    To the best of Jager's knowledge, DoorDash does not have a policy regarding its retention and use of photographs of debit cards provided by its users.  DoorDash's Consumer Terms and Conditions say nothing about verifying accounts by using photographs of bank debit cards, nor do they contain a policy concerning the retention and use of that information.

222.    zuMedia's Bank of America account often has millions of dollars in it.

223.    By effectively forcing Jager to provide her personal private information and personal corporate information, DoorDash has armed itself, its staff, its Dashers, its affiliates, its partners, and its third party service providers, including the one currently storing Jager's sensitive information, with the ability to rob or cause other harm or injury to Jager, her shareholders, and her company at any time it may or others may see fit.

224.    DoorDash collects personal and financial data from users without disclosing the identities of the third-party companies who will assist DoorDash in conducting the data collections are nor does it reveal how user data will be kept, sold, shared, used, studied, verified, or otherwise disseminated.

225.    DoorDash is aware of its own data breaches and it knows the sale of stored user data is generally the target. As it stated in its S-1, "We have been subject to cybersecurity incidents in the past and anticipate being the target of future attacks." Bad actors, hackers, etc. steal the data and sell it. Often the data of the users is sold in order to establish salable accounts for

undocumented workers. The innocent users are ever the victim and there's no telling what the price or duration of insurmountable suffering will be.

226.    DoorDash is a known thief and fraudster and has been declared by such by both the general public at large, and the court systems across the United States yet DoorDash had the audacity to label Jager a fraudster when Jager had conducted herself in accordance with the agreement between herself and DoorDash at all times.

DOORDASH CANCELS JAGER'S ACCOUNT ON A PRETEXT

227.    Upon Jager providing photographs of her zuMedia debit card and otherwise verifying that she is an authorized user of this card, DoorDash informed her it was canceling her account because, according to DoorDash, she was fraudulently using zuMedia's debit card which, according to DoorDash, does not belong to her.  A true and correct copy of a screenshot notifying Jager that her account had been cancelled is shown below.



228.    This was blatantly false, as the zuMedia debit card is issued in jointly Jager's and zuMedia's names and Jager is easily identifiable as the CEO of zuMedia Inc.

229.    Jager has been using her DoorDash account to order meals for zuMedia's Monroe Think Tank offices since at least 2021, and she has placed millions of dollars in DoorDash orders.

230.    During that entire time, Jager has almost exclusively paid for the DoorDash orders using her zuMedia corporate debit card, which has been on file with DoorDash. While the debit card numbers associated with this card have changed over the years, the account has not.  The zuMedia card has always been associated with the same Bank of America bank account, and both Jager's and zuMedia's names have been associated with it.

231.    DoorDash never questioned or raised any issue with the debit card used by Jager, nor did it complain about the lucrative business it was receiving from Jager, until Jager sent the November 6 notice.  DoorDash then canceled Jager's DoorDash account.  The unexpected, pretextual cancellation of Jager's account with DoorDash has had a costly impact on her as the CEO of zuMedia Inc., both to her reputation and the reputations of shareholders, as well as to her ability to ensure that the meals provided to zuMedia personnel remain one of the benefits of working for the company.  Jager, unlike DoorDash, has not been able to shirk her responsibilities and simply cancel the food orders.

232.    It is well known and highly publicized that DoorDash pilfers money designated as Dasher tips from customers.

233.    DoorDash's deceitful pilfering practices of stealing tip money assigned by Jager to a Dasher for a job well done harms Jager in ways such as damage to her and her company's reputation as it leads Dashers to believe Jager, Jager's shareholders, and her company zuMedia Inc. are being abusively cheap after Dashers have gotten up and gone to a designated location, waited for, picked up, carted an often considerably large and usually heavy order from the designated location to Jager's door, unloaded those orders, and dropped them off.

234.     Thousands of Dashers have made deliveries to Jager's doorsteps, and this means thousands are the number of times DoorDash likely applied this theft technique.

235.     Jager is well aware of how large and heavy the orders she has placed over the years are and she is well aware of how hard the Dashers work in order to deliver those orders daily. Jager is also aware of how time-consuming it is to wait for such large orders and tries to compensate for other orders a Dasher may not be assigned because he or she is tied up waiting for Jager's orders. Jager allocates tips larger than an average person may because it allows her, and indirectly her shareholders and company, the opportunity to thank the drivers and also compensate for orders possibly missed while waiting for Jager's orders. This was not considered by DoorDash as it pilfered the hard-earned tip money Jager allocated and Dashers came to expect and count on.

236.     DoorDash's tip theft makes Jager, her shareholders, and her company look incredibly abusive by not tipping a generous amount commensurate with the generous time a Dasher spends on one of Jager's large orders.

237.     DoorDash's tip theft, in addition to constituting fraud as well as violating the FLSA, will undoubtedly cause harm to Jager, her shareholders, and their company zuMedia Inc. by destroying their ability to hire quality workers in the neighborhood they reside in and work in. Dashers look for jobs other than driving for DoorDash and Jager looks to hire for her company as well. The potential driver employee pool would be the same for Jager as it is for DoorDash given that the drivers for either would serve the same geographic area.

238.     During the more than four thousand times Dashers have been to Jager's premises, Jager was under the impression Dashers were getting 100% of the tips allocated to them. By the fact DoorDash robbed tip money and Dashers knew they received low tips they will undoubtedly not want to work for Jager, her shareholders, or her company and will likely warn others that the

pay isn't what it should be. Jager's and zuMedia's reputations are now tarnished as a result of this practice.

239.    The United States Oversight (USOversight.com) stands to cater to and protect the people of America and their respective specific needs. It exists to bring support, assistance, and opportunity to the people of the United States and therefore better balance global infrastructure and relationships.

240.    The United States Oversight is a zuMedia company.

241.    The United States Oversight conducted a study.

242.    Recently, as part of a study conducted by US Oversight Inc., nearly two dozen minor children created accounts, ordered from DoorDash while at zuMedia's offices and had their deliveries handed to them by Dashers.

243.    This occurred because DoorDash has no provisions in place to safeguard those children, protect their identities and related information, and ensure the safety and personal information of the credit card holder of the card used by the minor children.

244.    None of the children were required to enter a date of birth at the time of placing the order and none of the children were required to perform any verification and authentication process at the time of the order.

245.    There were no safety warnings or instruction for children on how to protect themselves even though DoorDash knows it serves children.

246.    While at zuMedia's offices, all of the children, including a seven-year-old and a ten-year-old, were able to create their own email addresses, set up DoorDash accounts on their devices. The children were able to browse the DoorDash site, select items, check their order out

using a credit card that did not belong to them, receive order verification, observe their order in the works and on the way, see when their orders were approaching and receive their order.

247.    While a few of the Dashers left the orders at the door, most Dashers watched the children coming to the door to accept the orders, waited while the children opened the door and directly placed the orders into the hands of the respective child, including the hands of the seven- and ten-year-olds.[16] Below are true and correct photos of Dashers interacting and taking photos of these children.



---

[16] DoorDash has no formal policy regarding the retention of photographs Dashers take of children. As such, these photographs are subject to being sold and transferred to third-parties by Dashers and DoorDash.





248.    DoorDash is in violation of COPPA (Children's Online Privacy Protection Act), CCPA (California Consumer Privacy Act), CPRA (California Privacy Rights Act), PCI DSS (Payment Card Industry Data Security Standard), 18 U.S.C. § 1029 as well as all merchant agreements by exposing the children to such risks of harm.

249.    DoorDash has no authority or permission to collect information from minor children. DoorDash has no authority or permission to save and store information belonging to minor children. DoorDash knows minor children do not have their own credit cards in their own names and DoorDash knows a child has no power or authority to consent to anything in its Terms and Conditions, including a credit card transaction.

250.    DoorDash allows children to open up an account on its service and to use that account in such a manner whereas it results in a child making a charge on a credit card it can't lawfully consent to authorizing a charge. DoorDash knows if a child is using a credit card it's at least possible that child is using the credit card without the consent of its rightful cardholder and DoorDash is therefore facilitating unlawful credit card use by minor children.

251.    Jager, in DoorDash's Terms and Conditions never at any point agreed to engage with a company that willfully, neglectfully, and carelessly is in violation of as many laws and regulations as DoorDash is.

### DOORDASH'S CONDUCT EXCEEDS THE SCOPE OF IT'S TERMS AND CONDITIONS AND PRIVACY POLICY

252.    In agreeing to DoorDash's Terms and Conditions and Privacy Policy, Jager did not agree to submit to and be subject DoorDash's illegal conduct. This conduct far exceeds the scope of DoorDash's Terms and Conditions and Privacy Policy.

253.    Among other things, Jager did not agree to:

a.    Having deliveries made by Dashers who were not subject to adequate background checks;

b.    Having unvetted third parties accompany Dashers on deliveries;

c.    Having deliveries made by persons other than the Dasher listed on a DoorDash account;

d.    Having deliveries made by persons whom DoorDash never vetted;

e.    Having Dashers making deliveries as well as persons accompanying them photograph Jager's property and vehicles located there;

f.    Having personal communications sent to Jager by Dashers;

g.    Having the welfare of minors endangered by persons making deliveries on behalf of DoorDash;

h.    Being placed in danger by persons making deliveries on behalf of DoorDash;

i.    Being part of a money laundering operation conducted by DoorDash;

j.    Doing business with Dashers who lack personal liability insurance and thus have no recourse against them should they cause harm to her or her property;

k.    Providing DoorDash with unencrypted photographs of the front and back of her debit card, which likely resulted in Jager's information ending up on the Dark Web; and

l.    Having Jager's financial information shared with a payment processor who was fined $40,000,000 by the FTC for knowingly processing payments and helping launder credit card transactions in connection with scams perpetrated by high-risk merchants.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

254.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein.

255.    The DoorDash Consumer Terms and Conditions are, as expressly stated therein, a legal agreement between DoorDash and Jager, who is a consumer using DoorDash's services.  *See* Exhibit A.

256.    The Consumer Terms and Conditions provide that Jager may use DoorDash's services unless she violates the rules and prohibitions specified in Sections 5, 7, 8, 13, and 22.

257.    Jager has not violated any of the rules and prohibitions specified in the Consumer Terms and Conditions.

258.    Jager has performed all her obligations under the Consumer Terms and Conditions.

259.    DoorDash has breached the Consumer Terms and Conditions by falsely claiming that Jager is fraudulently using the debit card of another person when, in fact the debit card in question was issued to her, and by subsequently terminating her account.

260.    DoorDash knows its claim is false, as it has been informed that the debit card associated with Jager's DoorDash account was issued to Jager.

261.    Further evidence of DoorDash's knowing falsity is that Jager has used her zuMedia debit credit card on her account, charging substantial amounts, for at least three years without any issue being raised by DoorDash.

262.    DoorDash only raised an issue now because Jager sent the November 6 notice.

263.    While DoorDash claims in Section 22 of the Consumer Terms and Conditions that it has discretion to terminate any user's account, DoorDash is required to exercise that discretion in good faith.

264.    DoorDash's bad-faith, pretextual termination of Jager's account on or about November 21, 2024, breached the Consumer Terms and Conditions.

265.    As a direct and proximate result of DoorDash's breach, Jager has suffered and will suffer monetary damages in an amount to be determined at trial, but in an amount believed to be at least $100,000.

## AS AND FOR A SECOND CAUSE OF ACTION
(Breach of the Covenant of Good Faith and Fair Dealing)

266.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

267.    The DoorDash Consumer Terms and Conditions are, as expressly stated therein, a legal agreement between DoorDash and Jager, who is a consumer using DoorDash's services.  See Exhibit A.

268.    As such, the Consumer Terms and Conditions imposed upon the parties thereto a duty of good faith and fair dealing in the performance and enforcement of such contract.

269.    DoorDash's duty of good faith and fair dealing included the obligation to exercise in good faith its discretion in determining whether to terminate a user's account.

270.    This obligation is imposed by law.

271.    This obligation is also implied from the extensive set of rules and prohibitions (in Sections 5, 7, 8, 13, and 22) that the Consumer Terms and Conditions states may be the ground of termination, as the existence of these rules and prohibitions indicate that DoorDash will not terminate a user's account except in good faith and when the user has violated the Consumer Terms and Conditions.

272.    DoorDash breached its duty of good faith and fair dealing by terminating Jager's account in retaliation for her sending the November 6 notice.

273.    DoorDash's knowingly false, pretextual ground for terminating Jager's account breached its duty of good faith and fair dealing.

274.    As a direct and proximate result of DoorDash's breach, Jager has suffered and will suffer monetary damages in an amount to be determined at trial, but in an amount believed to be at least $100,000.

### AS AND FOR A THIRD CAUSE OF ACTION
(Defamation)

275.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

276.    On November 13, 2024, DoorDash falsely flagged Jager as a fraudster and made her provide a special PIN to every Dasher who delivered an order to her door.

277.    Dashers know that users who are required to provide a PIN in order for a delivery to be completed have been tagged as fraudsters by DoorDash.

278.    Every time a Dasher made a delivery to Jager and was required to obtain a PIN from Jager, the Dasher had been informed by DoorDash that Jager was a fraudster.

279.    Jager has not and does not engage in fraud and has never used a credit or debit card with DoorDash that does not belong to her.

280.    By requiring Dashers to obtain a PIN from Jager, DoorDash falsely stated to them that Jager engaged and/or engages in fraud. By alerting all Dashers that went to Jager's premises up until the time her account was terminated, it damaged her reputation and caused harm. By enacting a PIN code verification system and applying that directly to Jager's account in such a way whereas a PIN code must be supplied by the user [Jager] and then entered by the Dasher in order for the Dasher to hand over an order DoorDash publicly announced Jager was a fraud. Dashers know when

they see this system protocol engaged it means fraudulent use of an account exists. This was the case over a period of days. This was the case during a time Jager did and does always use her account heavily.

281.    On November 18th, DoorDash alerted Jager by website popout alert, demanding that she verify the debit card listed on her DoorDash account for payments by scanning the debit card and allowing DoorDash to have a copy of all the information on the card.

282.    After putting Jager through such unnecessary and dangerous exposure, DoorDash did not verify that it was in fact Jager's card, the very same card Jager had used in the past, rather it flagged Jager for fraud. This in itself verifies that DoorDash's systems are inadequate, to say the least, and that DoorDash has no control over user data.

283.    As Jager orders meals for zuMedia personnel on her own DoorDash account, she uses her zuMedia corporate debit card, issued in both her and zuMedia's names to pay for those orders. It is the flawed fraud prevention system algorithms that triggered the alert and the inability of DoorDash staff, software, and systems to properly interpret the alerts that triggered the popout alert on Jager's account.

284.    But upon Jager verifying the card she uses for the account, DoorDash informed her it was canceling her account because, according to DoorDash, she was fraudulently using a card that does not belong to her.

285.    Upon information and belief, DoorDash's flawed systems flagged Jager's card which caused Jager's bank to flag her card, which caused other merchants to flag Jager's card and also label her as a fraudster. This ultimately caused Jager to not be able to order in similar service merchants as well and for Jager to become known within internal systems as a high-risk user. Because of

DoorDash's incompetence, carelessness, and greed, to this day Jager is now flagged within UberEats and has a digitally unsteady relationship with GrubHub.

286.    After four years of extensive ordering, and with Dashers becoming accustomed to delivering to Jager's premises with frequency, DoorDash has made Dashers aware that Jager's DoorDash account is no longer operational as a result of canceling her account.

287.    Prior to Jager's call with DoorDash, Jager routinely had successfully used her zuMedia corporate debit card to place orders with Uber Eats and Grubhub food delivery services.

288.    But since the incident with DoorDash, Jager has been unable to consistently use her zuMedia debit card to place orders with any of those food delivery services.

289.    There has been no change to Jager's accounts with those food delivery services since well before the call with DoorDash because Jager made the mistake of being loyal to DoorDash and did not use her other accounts after finding DoorDash four years ago.  The only reason for those services to suddenly decline Jager's card is that they were informed directly or indirectly that she had used the zuMedia corporate debit card to commit fraud.

290.    Upon information and belief, DoorDash was, at a minimum, negligent in making statements either directly or indirectly to third parties that Jager had used the zuMedia corporate debit card for fraudulent purposes because, among other things, DoorDash knew that the zuMedia debit credit card was properly issued in Jager's name and that it (the account) had been used by Jager to place orders on DoorDash since 2021.

291.    DoorDash's false statements to its Dashers and to one or more third parties are not protected by a privilege.

292.    DoorDash acted with actual malice or with reckless disregard for the truth of the matter contained in DoorDash's false statements to its Dashers and third parties.

293. False statements that are directed to honesty, efficiency, or other business character traits amount to defamation per se.

294. Here, DoorDash has published statements that Jager was committing fraud.

295. DoorDash's false statements constitute defamation per se.

296. Additionally, Jager incurred special harm, including, but not limited to, suspension from placing food orders with Uber Eats and Grubhub and extensive damage to Jager's reputation.

297. Jager is entitled to damages, costs, and fees as allowed by law.

298. Jager has suffered substantial injury, and unless DoorDash is enjoined from such activity, she will continue to suffer injury.

299. At all relevant times, DoorDash knew that Jager was authorized to use her credit cards and had not engaged in fraud.

300. As Jager orders meals for zuMedia personnel on her own DoorDash account, she uses her zuMedia corporate debit card to pay for those orders.

301. But upon Jager verifying the corporate card she uses for the account, DoorDash informed her it was canceling her account because, according to DoorDash, she was fraudulently using a card that does not belong to her. Further, DoorDash not only falsely accused Jager of fraud it launched a public smear campaign effectively publicly calling Jager out as a fraud and announcing it to every driver who picked up an order by, over a period of days, using a demeaning PIN code verification system publicly known to only be applied to accounts whereas special frauds are suspected or known to occur.

302. But Jager wasn't committing fraud. Jager is in fact Jager. The card Jager attempted to use in this transaction and did use in numerous other transactions belonged to Jager both at the time of these most recent interactions with DoorDash and throughout Jager's entire relationship with

DoorDash—up to and including when they collected substantial fees as a direct result of Jager's business and when DoorDash helped itself to tip money Jager allocated to Dashers.

303.    Jager's good reputation is extremely important.

304.    Jager is the CEO of zuMedia.  zuMedia develops innovative technologies imagined to serve and service the public, including fatSu and PalmPens, which are products intended to generate revenue that will sustain zuMedia's humanitarian efforts, DMDb.com, which offers revenue-generating streams that will put money directly into the pockets of the American public as well as the global world beyond, and the patented Backskin advertising technology, which stands to revolutionize online advertising by allowing internet users to earn a living wage by utilizing their online profiles.

305.    As the CEO of a company that has a certified valuation document declaring it is the most valuable company in existence today and that company intends to dedicate a significant portion of its profits to the public good, the damage to Jager's reputation caused by DoorDash's conduct is substantial, which has a direct detrimental effect on the company's public perception.

306.    As a direct and proximate result of DoorDash's defamatory conduct, Jager has suffered and will suffer monetary damages in an amount to be determined at trial, but in an amount believed to be at least $500,000,000.

307.    By reason of DoorDash's egregious and improper conduct, Jager is further entitled to punitive damages in an amount to be determined at trial, but in an amount not less than $500,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Fraud)

308.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

309.    DoorDash through its app and websites made representations to Jager that (a) by paying the $2.99 Express fee, Jager's orders would be delivered on an expedited basis and (b) the full amount of the tips paid by Jager would be given to Dashers. Below is a true and correct copy of a screenshot showing Jager's payment of the fraudulent $2.99 Express fee.



310.    None of these statements were true.

311.    Jager relied on these statements by paying the Express fee for nearly all if not all of the orders Jager placed with DoorDash and by leaving substantial tips Dashers in connection with all if not all orders Jager placed with DoorDash.

312.    At all relevant times, DoorDash knew that the payment of an Express fee by Jager did not result in any expedited deliveries and that it was pocketing a portion of the tips paid by Jager.

313.    As a result of Jager's reliance on DoorDash's false statements, Jager paid unnecessary Express fees and tips in an amount to be determined at trial but believed to be at least $750,000.

314.    With every transaction, so more than 4,000 times, Jager was deliberately deceived by DoorDash. By reason of DoorDash's egregious and improper conduct, Jager is further entitled to punitive damages in an amount to be determined at trial, but in an amount not less than $10,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Declaratory Judgment – 28 U.S.C. § 2201)

315.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

316.    Jager contends that DoorDash's termination of her account was unlawful, made on a pretextual ground, and thus in violation of the DoorDash Consumer Terms and Conditions.

317.    DoorDash contends that its termination of Jager's account complied with the DoorDash Consumer Terms and Conditions.

318.    Jager further contends that DoorDash misused the 60-day period that Jager is required to wait following her service of a notice of intent to initiate an informal dispute resolution conference to take retaliatory action against Jager.

319.    While the Consumer Terms and Conditions required DoorDash to have made good-faith efforts to resolve the dispute with Jager, DoorDash did not make any good-faith efforts to resolve the dispute, nor, indeed, any efforts at all.

320.    Instead, DoorDash publicly accused Jager of fraud and terminated Jager's account with DoorDash on pretextual grounds and a false accusation of fraud.

321.    Indeed, it was not until December 17, six weeks after Jager sent her November 6 notice to DoorDash and after Jager had commenced a lawsuit regarding DoorDash's misconduct, that DoorDash finally contacted her attorney.

322.    DoorDash's conduct has breached the dispute resolution procedure DoorDash imposes on its users.

323.    Jager contends that, by virtue of DoorDash's numerous breaches, she has been relieved of her obligation to comply with the dispute resolution procedure in Section 14 of the Consumer Terms and Conditions, including the requirements to attend an informal dispute resolution conference, to have to wait until after that conference to pursue litigation against DoorDash, and then to have to pursue that litigation by arbitration.

324.    DoorDash's Terms and Conditions imply that all parties adhere to these terms in its entirety. From its inception DoorDash has breached its obligations to the contract therefore Jager should not be bound by its provisions. Moreover, DoorDash further breached its agreement with Jager by summarily canceling her DoorDash account without any justification in retaliation to

Jager's request for informal dispute resolution citing many of DoorDash's operational flaws, and risks to the general public.

325.    Under no circumstances within its Terms and Conditions or Privacy Policy does DoorDash specify that DoorDash will demand an image of the payment method used for a transaction. Jager was coerced into providing an image of the debit card that was entered as method of payment for the transaction that led to the termination of her account. Jager was unaware that such egregious exposure was even a consideration let alone a real possibility and certainly by no means did Jager ever agree to such when accepting the Terms and Conditions and Privacy Policy, thus DoorDash's conduct falls outside the scope of the Terms and Conditions and Privacy Policy and should therefore not be subject to the Arbitration Agreement.

326.    Upon information and belief, DoorDash will contend that it has complied with its obligations under the Consumer Terms and Conditions, it did not misuse the 60-day waiting period, and it did not engage in any improper action toward Jager, but among other things, DoorDash itself is gravely in violation of its own arbitration, Terms and Conditions, and Policy statements.

327.    An actual and justiciable case or controversy therefore exists between DoorDash and Jager regarding the status of Jager's account and whether Jager is required to comply with DoorDash's dispute resolution procedure.

328.    Jager respectfully requests that this Court enter a judgment declaring that Jager's account with DoorDash shall be restored to active status and may not be terminated by DoorDash in the future unless it demonstrates Jager has violated DoorDash's rules and prohibitions in Sections 5, 7, 8, 13, and 22 of the Consumer Terms and Conditions.

329.    Jager respectfully requests that this Court enter a judgment declaring that Jager is not further required to comply with the DoorDash dispute resolution procedure in Section 14 of the

Consumer Terms and Conditions, including that Jager is not required to attend an informal dispute resolution conference with DoorDash, is not required to wait until that conference before commencing litigation against DoorDash, and is not required to arbitrate its dispute with DoorDash but may proceed with her claims in this Court.

## AS AND FOR A SIXTH CAUSE OF ACTION
(False Advertising – 15 U.S.C. § 1125)

330.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

331.    DoorDash's representations to consumers about the background checks and the safety measures it takes are a form of advertising to consumers about why they should use its services.

332.    DoorDash lured Jager and the general public to the services by falsely advertising promises of overall safety and has repeatedly failed to deliver but Jager could not have possibly known this would be the case during her early time as a DoorDash customer. Jager trusted the service was operating with reasonable duty of care.

333.    DoorDash's representations were misleading and/or false, as it does not engage in proper processes for verifying Dashers and cannot truthfully assure consumers of their safety and security when dealing with Dashers.

334.    DoorDash made additional false representations to the public that (a) by paying the $2.99 Express fee, consumers' deliveries would be made on an expedited basis and (b) all the tip money paid by consumers would go to Dashers.

335.    In making decisions as to whether to use DoorDash's services, Jager and other consumers believed and relied on DoorDash's representations to consumers about the background

checks, the safety measures, expedited service and tips and were thereby induced to use DoorDash's services.

336.    Indeed, DoorDash intended for them to believe and rely on these representations and made them to induce Jager and other consumers to use its services.

337.    As a result of DoorDash's false and misleading advertising, Jager has been harmed, both by being improperly induced to use DoorDash's services and pay it fees and by being exposed to an ongoing risk of harm from the persons DoorDash has utilized and/or permitted to make deliveries for it in an amount to be determined at trial but believed to be at least $10,000,000.00.

338.    In addition, Jager has been harmed by paying tips that were not fully given to Dashers and needless $2.99 Express fees in an amount to be determined at trial but believed to be at least $750,000.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
(Deceptive Conduct – N.Y. General Business Law § 349)

339.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

340.    DoorDash's false representations to consumers about the background checks and the safety measures it takes are consumer-oriented conduct and pose a substantial risk to the safety of the public as shown in the media reports cited in Paragraphs 14 and 25-29 above.

341.    DoorDash's representations were materially misleading and/or false, as it does not engage in proper processes for verifying Dashers and cannot truthfully assure consumers of their safety and security when dealing with Dashers. DoorDash, in fact has intentionally enacted as their gold standard of messaging, communication methods which are unclear and downright dizzying in

79

order to avoid being clear to its consumers and Dashers regarding its verification processes, who is verified, re-verified, how often, etc.

342.    In making decisions as to whether to use DoorDash's services, Jager and other consumers believed and relied on DoorDash's representations to consumers about the background checks and the safety measures and were thereby induced to use DoorDash's services. Jager would not have engaged in the services provided by DoorDash had she been aware of the deceptive and dangerous practices which it engages in daily in order to maintain financial solvency.

343.    As a result of DoorDash's deceptive conduct, Jager and the general public have been harmed, both by being improperly induced to use DoorDash's services and pay it fees and by being exposed to an ongoing risk of harm from the persons DoorDash has utilized and/or permitted to make deliveries for it in an amount to be determined at trial but believed to be at least $10,000,000.00.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(False Advertising – N.Y. General Business Law § 350)

344.    Jager restates the allegations set forth in paragraphs 1 through 253 above as if fully set forth herein again at length.

345.    DoorDash's representations to consumers about the background checks and the safety measures it takes are a form of advertising to consumers about why they should use its services as well as representations regarding its Express fee and the full amount of tips going to Dashers.

346.    DoorDash's representations to consumers about the background checks and the safety measures it takes are consumer-oriented conduct.

347.    DoorDash's representations were misleading and/or false, as it does not engage in proper processes for verifying Dashers, cannot truthfully assure consumers of their safety and security when dealing with Dashers, does not make expedited service as required, and does not pay Dashers all the tip money paid by consumers.

348.    In making decisions as to whether to use DoorDash's services, Jager and other consumers believed and relied on DoorDash's representations to consumers about the background checks, safety measures, expedited service, and tips, and were thereby induced to use DoorDash's services.

349.    Indeed, DoorDash intended for them to believe and rely on these representations and made them to induce Jager and other consumers to use its services.

350.    As a result of DoorDash's false and misleading advertising, Jager has been harmed, both by being improperly induced to use DoorDash's services and pay its fees and by being exposed to an ongoing risk of harm from the persons DoorDash has utilized and/or permitted to make deliveries for it in an amount to be determined at trial but believed to be at least $10,000,000.00.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Jager respectfully demands a jury trial of all issues triable to a jury in this action.

**WHEREFORE**, Jager requests that the Court enter judgment in favor of Jager and against DoorDash, granting the following relief:

1.    Preliminarily and permanently enjoining DoorDash from (a) making false and misleading statements regarding its verification of Dashers, the safety of its services, the purpose of the Express fee, the allocation of the tips it collects and Jager; and (b) collecting photographs of its users credit and debit cards.

2.      Declaring that Jager is not further required to comply with the DoorDash dispute resolution procedure in Section 14 of the Consumer Terms and Conditions, including that Jager is not required to attend an informal dispute resolution conference with DoorDash, is not required to wait until that conference before commencing litigation against DoorDash, and is not required to arbitrate its dispute with DoorDash but may proceed with her claims in this Court.

3.      Awarding compensatory damages on the First Cause of Action, in an amount to be determined at trial, but in an amount not less than $100,000;

4.      Awarding compensatory damages on the Second Cause of Action, in an amount to be determined at trial, but in an amount not less than $100,000;

5.      Awarding compensatory damages on the Third Cause of Action, in an amount to be determined at trial but believed to be at least $500,000,000;

6.      Awarding punitive damages on the Third Cause of Action in an amount to be determined at trial but not less than $500,000,000;

7.      Awarding compensatory damages on the Fourth Cause of Action, in an amount to be determined at trial but believed to be at least $750,000;

8.      Awarding punitive damages on the Fourth Cause of Action, in an amount to be determined at trial but believed to be at least 10,000,000;

9.      Awarding compensatory damages on the Sixth Cause of Action, in an amount to be determined at trial but believed to be at least $10,750,000;

10.     Awarding compensatory damages on the Seventh Cause of Action, in an amount to be determined at trial but believed to be at least $10,000,000;

11.     Awarding compensatory damages on the Eighth Cause of Action, in an amount to be determined at trial but believed to be at least $10,000,000;

12.    Declaring that Jager's account with DoorDash shall be restored to active status and may not be terminated by DoorDash in the future unless it demonstrates Jager has violated DoorDash's rules and prohibitions in Sections 5, 7, 8, 13, and 22 of the Consumer Terms and Conditions;

13.    Declaring that Jager is not further required to comply with the DoorDash dispute resolution procedure in Section 14 of the Consumer Terms and Conditions, including that Jager is not required to attend an informal dispute resolution conference with DoorDash, is not required to wait until that conference before commencing litigation against DoorDash, and is not required to arbitrate its dispute with DoorDash but may proceed in this Court;

14.    Awarding Jager the costs and disbursements of this action and, to the extent permitted by law, her attorney's fees;

15.    Awarding pre-and post-judgment interest at the maximum rate allowed by law; and

16.    Granting such other and further relief as the Court deems just and proper.

Dated: March 7, 2025

Respectfully submitted,

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Plaintiff*

By: _____
Joel H. Rosner
Iris Velasquez
1350 Broadway
New York, New York 10018
Phone: (212) 216-8000
jrosner@tarterkrinsky.com
ivelasquez@tarterkrinsky.com